With 24-9573, Jimenez v. Bondi. Mr. Barringer. Matthew Barringer on behalf of the petitioners. So first and foremost, your honors, I think the first thing that the court needs to note that both with the Board of Immigration Appeals and with the immigration judge that they found the petitioner to be credible in all of his testimony. So everything that the respondent, excuse me, petitioner had stated during his hearing from the immigration judge is undisputed, we would assert. Now, whether or not that fits in with an asylum and things we're going to talk about here in a moment, that's for contention, but everything he said was credible. So with those, with that, I want to just go over some seminal facts I think are very important for today's hearing. First and foremost, the petitioner was part and participated in the Colombian Liberal Party as far back as 2015. He also, another facet of his life is he was an owner of a factory for furniture and the like. And third, he also worked in the Colombian Prosecutor's Office as I think we would call the United States as an intern, aspiring to become an attorney. Now, during which time he worked with domestic violence victims and other helping with investigation of other criminal activity. Now, as it relates to the Colombian, him being in the Colombian Liberal Party, he participated by canvassing. The record shows he was canvassing, was going out giving out pamphlets, campaigning for the party for which he was a part of. So he was out in the open. People in the community knew that he was part of that political party. And at the same time, to shift gears, as I said beforehand, he was also with the Prosecutor's Office. So while at the Prosecutor's Office, as referenced in the briefs, he was approached by a Leonor Algona Romero to evict a certain individual from her home. Again, in America, I think we'd say it was through a divorce settlement and she was trying to get him out. Now, this house was also kind of a house of ill repute. It was a house that they were running drugs and other criminal activity. The petitioner learned that while he was investigating and trying to get this individual out. So both of these instances happened June of 2022. At the same time, there was also an election. That election included a Federico Gutierrez. He was an individual who was with the Colombian Liberal Party. And then also a Gustav Petro. Now, very quickly, a little bit about Gustav Petro. Petro was a bit of a pain in the side of the Colombian government. He was a guerrilla. He was a part of M-19. And he was the first president, first leftist president, to be appointed. Now, the record did reflect in the testimony from the petitioner that Mr. Let me shift gears for a moment. Don Roth, the individual who was being evicted, was also had connection with and was also a part of that party, the leftist party. So we have two separate... Leftist party, not M-19 itself, though. And, Your Honor, we're referring to as him as to who, I'm sorry. The person who's being evicted. Correct. He was part of the FARCC. But I would say that the two of them aligned with one another. Both were both engaged in the southern part of Colombia, engaging in guerrilla warfare, were trying to overthrow the government. In fact, Mr. Petro had been jailed on several occasions prior to his ascension to the presidency of that of Colombia. So we have two threats that were subsequently made while the petitioner was both campaigning for the Colombian Liberal Party, first, and second, while he was a member of the district attorney's office, I would say loosely, prosecutor's office there in Colombia. There were four threats that were levied against the petitioner. Counsel, can I ask you about waiver? So the government says that you waive parts of your argument. What's your response to that? And, Your Honor, which parts specifically? They said that you waived any allegations that he suffered physical threats and that in the unable or unwilling prong of the refugee definition that any ties that the persecutors had to the president who won that election, that both of those arguments were not raised below. Certainly, the latter is not part of the BIA's order, and that you don't, and so that they're not properly before us. And of course, government says that in response. We don't have a reply brief from you, so I want to give you an opportunity to address waiver. So I do not believe in our brief, our opening brief, that we waived those arguments. I think that we raised both of those arguments as to— About whether they were preserved below then. We can't hear an argument that wasn't made to the BIA. Understood, understood, and we were in counsel for those arguments. So I would just have to stand the arguments that I'm going to be making to the court today. Yeah, we as subsequent counsel received it and made the arguments that we felt that were appropriate from the record that was established with the immigration judge. What's the primary fact that demonstrates past persecution? That's a very good question. Judge, I do not—frankly, I think we're a little weak on past persecution. I think that there are arguments to be made that the cumulative nature of the four instances, the threatening him at his place of work with a pistol, him contacting his child at school with what seemed to be an attempted kidnap of his child, pointing a gun at one of his employees at the factory, threatening, hey, where is he? And in that interaction, he both said, not only because of the Colombian liberal party, but also for the fact that he was hindering their ability to operate out of this house owned by Don Roth. Yeah, I mean, those certainly are and could be perceived as threatening, but we have cases also that probably have worse facts for the petitioner where we've affirmed the BIA's denial of asylum or withholding of removal. Is there—what's the best case that would support your fact pattern? Well, and that's why I respond the way I did, Judge, is that, as I said, I don't think that we do have problems with past persecution. I do think that there is some case law that we have an argument, a prima facie case, if you would, but I would agree with you, Judge, that we're tough on that. That said, though, the immigration judge at the trial court level ruled that the threats that were received by the petitioner were solely private. We disagree with that. At worst, they were a mixed nature, both in his capacity as working for the Colombian Liberal Party and also his capacity working for the National Prosecutor's Office. The immigration judge doesn't have to—cannot say—cannot ascertain exactly. It doesn't have to be exactly what it is. The central reason is really what the immigration judge should be looking at. An immigration judge, in our view, just ignored the fact that there was these threats that he was in the Colombian National Party and a part of the prosecutor's office. It wasn't a situation where the petitioner's going out and just trying to get a tenant out of his house. This is a time—this was—he was approaching his capacity working for the fed—the government in Colombia to have this individual removed. Well, what do you—you just said, I think, that the test the IJ is supposed to rely on is whether—what was the central motive. Is that correct? Do you agree with that? I would agree with that. Okay. And so you have two possibilities. The IJ could make a finding that in the circumstances here, the—it was the eviction that was the big thing. That was the major issue. I would—my response would be that the IJ can do that, but not to the exclusion of the other. I think— Well, if one—if what you're looking for is the central motive, then you are excluding the lesser motives. He could acknowledge that there might have been something else going on, but the core of it was he didn't like being evicted from this home, this residence that he was using for illegal activity. I understand that. I— Don't we have to defer to the IJ on that? I would say that that is—I would assert that the ultimate finding is a matter of law, not a matter of fact. And I think that the court can look at that finding de novo, rather, with substantial evidence as to facts. We had a—to help out a little, we had a recent case, published case, OCV. Did you happen to run across that? I have not. It's just out in the last couple of weeks. I happen to be on the panel. But that case discusses circumstances where you can have a mixed motive. So you might have an argument that there's two central reasons. And, Your Honor, I was going to get there. Okay. And the court just articulated where I was going to go, is that there is a central motive and there can be a mixed motive. Because—and the reason that I think that the court had reasoned that is that they cannot be looked at in a vacuum. We don't need to know exactly what the persecutor's reasoning is, other than what is put before the record. And what was in the record at—with the immigration judge was both, as I said, your snitch, as relates to the national—excuse me, and death to all those in the Colombian Liberal Party. And so, running short on time, the item is this, is that while I conceded to a degree that past persecution were weak, and I think that when it comes to well-founded fear, I think that the petitioner does have a strong argument with regard to that. Why can't he relocate within Colombia? Because it's a national office. You have Don Rafa, who the petitioner testified to has connection with the president of Colombia, who, as I say at the very beginning of my remarks, is a far-leftist Marxist. It is well-established. And he was a posit to that of the Colombian Liberal Party. So the idea, just because, as the IJ found, that he was able to go and relocate for three weeks at his mom's house outside Bogota, that in and of itself is dispositive as to whether or not he can safely relocate. We would assert that by virtue of the— Well, he has to show that the government's unwilling or unable to protect him. Agreed. And in the record below, it did— the petitioner did credibly testify to that it had been reported, and that he was concerned that it would take time before the prosecutor's office could get around to prosecuting any of these allegations. Yeah, but doesn't the record also show that when he was attempting the eviction, that search warrants were executed at Don Rafa's residence, and that was what led to some of the threats? In other words, the government was involved in a manner that would suggest that they were able to take action against these persons who may persecute him. So doesn't that sort of lean the opposite way? Well, my response would be is that certainly they were looking— there were actions taken by the Colombian government to prosecute Don Rafa. That does not necessarily mean that they were there to protect the petitioner. They had executed those search warrants, but if I remember correctly, there was nothing in the record that showed that Don Rafa or any of his associates had been arrested. It's the old adage, justice delayed is justice denied. And I think that's the case here. Certainly, we come across this all the time where there is certain action, but whether that action is actionable to protect the victim, it's munting very much of the time. And I would like to reserve the rebuttal that I may have, Judge. You may. Thank you. Ms. Arthur? Good morning, Your Honors. May it please the Court, Ashley Arthur for the Attorney General of the United States. The petition for review should be denied for four reasons, two of which are just positive. Real quickly, unable and unwilling is just positive. Nexus is just positive. And then on top of that, petitioner failed to establish past persecution that rose to that extreme level of persecution. And he failed to establish that he cannot relocate away from the harm he fears. With respect to this unable and unwilling argument, substantial evidence supports the agency's decision because we have, for example, in the record that shows Columbia Health officials condemned the property that Don Roth occupied. That is the man that petitioner fears. We have evidence that shows that petitioner testified that criminals were prosecuted, quote, normally. End quote. He confirmed there's a process in place to investigate criminals. He confirmed that criminals are held accountable. His own father, at the time of his 2024 merits hearing, continued to work for the criminal justice system. And he stated that his father reported no problems and that his father is not corrupt. Petitioner's wife also testified to the fact that not everyone in the Columbia government is in FARC's pocket. She testified, quote, good people, end quote, are in the Columbia government. And that's at page 295 in the record. As for those two police encounters that petitioner relies on as somehow proving this unable and unwilling element. First, the first encounter, petitioner was not asking for help. He was there in his capacity as a provisional lawyer. The second encounter occurred right before he left Columbia. And we know that he told the officer about his problems. And the officer reportedly said, quote, it's best you leave, end quote. And that's pretty much all we know about that. Is it correct that Columbia has a national police force? Yes, there's a national police force. But these, from what I understand of the record, were local police and a local patrol officer. At this time, too, when he approaches this officer, he's already at his mother's country home. So he approaches an officer that's not even in the area where he's experiencing the problems, which is Bogota itself. And these two brief encounters with these officers, especially the remark from the latter officer, do not prove that the government of Columbia as a whole is unable or unwilling to protect. There's no evidence that the officers were hostile. There's no evidence that the officers were high ranking. And this court, Sister Circuit in the 7th, has pointed out that a police officer may express apathy. But a one-off conversation with such a police officer doesn't necessarily prove that the government is unable or willing to protect the petitioner. Well, who else could he have reported these threats to? Petitioner could have reported these threats to many of his law enforcement contacts that he had through his job at the prosecutor's office for two and a half years, or his father himself, who works in the criminal justice system. Does the record reflect that he did report the threats? No, he did not report. Anybody that could do something about him, other than local police? He worked for the National Columbia Prosecutor's Office for two and a half years, and he never reached out to any other law enforcement contacts. He never asked for help except for that one interaction before he left Columbia. So that alone, that unable and unwilling element, is sufficient to deny the petition for review. And Nexus is also just positive. Did you run across our OCV case? I did, Your Honor. Couldn't we have a mixed motive theory here that might save the day for him? So this court does recognize, and always has recognized, that there can be two central reasons that are competing for each other, but he doesn't establish that. Petitioner doesn't identify record evidence that compels that conclusion. And one of the main problems in OCV was this family particular social group issue, and how the board and MRS basically created a situation where it prematurely stopped its analysis once it discovered this unprotected ground. It kind of foreclosed a mixed motive opportunity for family group, social group claims. That is not the issue here. And here, the agency properly discussed the protected grounds, and properly discussed the non-protected grounds to conclude that the evidence didn't show that the central reason here was a protected ground. What we have is henchmen who arrive at the factory, and they mention that there's ongoing search and seizures, which is interesting because at this point, it's September, the men arrive, Kipan season is already over, President Petro is already in office, and yet there's still ongoing search and seizures. So that really undermines that there's an excess and unwilling in that sense. And also, the petitioner met Don Raffa once face-to-face for a negotiation in his capacity as a provisional lawyer. He was trying to get the back pay. And that interaction happened in June when the campaign season was still ongoing. Don Raffa does not mention politics. Don Raffa does not harm petitioner. So, really, at the bottom of this Nexus question is, is the record evidence so compelling that no reasonable fact finder could find against petitioner here on Nexus? I say the answer is no. I think it's pretty obvious. And my friend has already admitted that his past persecution claim is fairly weak. Can I ask you about the attempted kidnapping of the son, which petitioner witnessed? Again, the immigration judge found his testimony credible. I mean, that one to me seems perhaps categorically different in that it's alleged that one of the persecutors not just approached the son, but actually physically grabbed the son, put his hand around his mouth. That required an assault of the potential persecutor to get him off his son. So how do we weigh the findings regarding that particular incident when it comes to persecution? And then, if you recall, was there any allegation or tying that incident, particularly in terms to a protected group? I will try my best to answer your question with respect to how it applied to all the elements without muddling them too much. So, first, petitioner and his wife, when we're talking about the harm itself and how that would speak to, perhaps, whether the harm rose to the extreme level of persecution, petitioner and his wife both testified that they did not suffer physical harm. On page 290 in the record, petitioner's wife testified, quote, physically, thank God, nothing happened to my children or my husband, end quote. Petitioner also testified, no, no, not physical, no, thank God. So if petitioners themselves do not consider that to be physically harmful, that should end there and counsel's assertions to the contrary are not evidence. Now, it's obviously a stressful and psychologically unsettling event. It's a parent's worst nightmare for a strange man to approach your child. And the IHA did consider that. And the IHA still concluded that, cumulatively, this record does not compel that conclusion that the harm rose. And that strange young man at the school did not mention politics or Don Rafa. So there's no nexus there. And as for the other part of your question, which was, I believe, how it related to. No, you answered it. I want to know about persecution and nexus. So I'm just going to move on real quickly to relocation because my friend understands that that past persecution part of his claims are pretty weak. Relocation is not established here. He bore the burden because he didn't establish all these elements of his past. The persecution claim within the meaning of the Immigration Nationality Act, meaning he didn't establish unable and willing. He didn't establish nexus. He admits that his claim about the harm rising to the level of past persecution is pretty weak. So he bore the burden of showing that he can't reasonably relocate within Columbia. And here he did live peacefully at his mother's home for three weeks. He didn't try to relocate beyond very far from the source of his problems. His problem was in Bogota. Columbia is an enormous country. None of his family members have been contacted about his whereabouts. And while he does try to tether some connection between Don Rafa and the current president, his brief lacks record citation to support those assertions. And I maintain that he's exhausted any resemblance of a government-sponsored claim because he did not argue before the board in his council BIA appeal that there is a government-sponsored claim here. He didn't dispute at all that the IJ's findings regarding private factors. He didn't dispute that that's all he feared. And if the court has no other questions, I will conclude the petition for review should be denied, your honors, because he does not compel reversal of the agency's decision. There's no record evidence that would compel reversal of the agency's decision. And that's the burden that petitioner must meet here today. Thank you. Thank you, counsel. We have a minute and a half. Yes. Thank you, your honors. So to summarize, we would assert the nexus has been established. That the threats were due to a political belief and his political association. The threats were mixed. One is capacity as a prosecutor. One as his position within the Colombian Liberal Party. And again, therefore, nexus has been established. He does have a well-founded fear of returning to that of Colombia, both objectively and subjectively. Objectively, by virtue of the threats that we've talked about earlier today. And subjectively, his positions that he held prior to him entering the United States with his family. As relates to the unwillingness to protect, I think it goes to the fact that even though his position within the prosecutor's office with the new regime that had been in place, that even with what the government would argue were those safeguards, didn't exist. And he still was not protected, even though they're doing search warrants, even though they were doing these other activities. And finally, as it relates to his relocation, we've already gone over that. So with that, Your Honours, we would ask that the petition be granted and the matter be remanded with further instructions. Thank you very much for your time, Your Honours. Thank you, Council. Case is submitted and Council are excused.